IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pamela Kolega, : 
             Petitioner : 
              : 
        v. : No. 2056 C.D. 2014
          : Argued:  September 17, 2015
State Civil Service Commission : 
(Department of Education), : 
             Respondent : 


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
PRESIDENT JUDGE PELLEGRINI          FILED: October 15, 2015


      Pamela Kolega petitions for review of the order of the State Civil Service Commission (Commission) dismissing her appeal and affirming her furlough by the Department of Education (Department) from her position of English Language Education Advisor 2 (ELEA 2) under the Civil Service Act (Act).[1]  We affirm.

---

[1] Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §§741.1-741.1005.  Section 3(s) of the Act defines "furlough" as "the termination of employment because of lack of funds or of work."  71 P.S. §741.3(s).  *See also* Section 101.1(a) of the Commission's regulations, 4 Pa. Code §101.1(a) ("Furloughs shall occur only because of lack of funds or lack of work.").

**I.**

Kolega is an older female, aged 65, and is disabled by chronic rheumatioid arthritis. In May 1995, the Department hired her in the position of Basic Education Associate 1 (BEA 1) in the Department's Bureau of Teaching and Learning (Bureau), Migrant Education Division. In June 2000, Kolega was promoted to the position of World Language Education Advisor 2 in the Bureau's Curriculum Division. In June 2011, she was furloughed and was reassigned as the only employee in the ELEA 2 position in the Bureau's Curriculum Division. Positions in the Curriculum Division are funded through the Commonwealth's general government operations (GGO) fund.

In February 2013, the Governor's Budget Office issued the proposed budget for the 2013-2014 fiscal year, which indicated that the Department would be required to eliminate 21 GGO-funded positions. The Department chose to abolish 18 vacant positions, and three Deputy Secretaries were directed to eliminate one GGO-funded position each. The Department concluded that Kolega's duties could be performed by other employees based on a reorganization plan and her GGO-funded ELEA 2 position was eliminated.

Kolega's ELEA 2 position was covered by the collective bargaining agreement (CBA) between the Commonwealth and the Federation of State Cultural and Educational Professionals (Union), and the furlough procedures under the CBA permit bumping to positions in classifications previously held in a seniority unit.[2] In August 2013, Kolega was advised of her furlough from the ELEA 2

---

[2] Section 802(a), (c) of the Act provides, in relevant part:

**(Footnote continued on next page…)**

2

position and she accepted a bump to a vacant BEA 1 position in the Bureau's Student Services Division, a position that she had previously held.

## II.

In August 2013, Kolega filed an appeal of the furlough and the bump demotion.[3]  She alleged that the demotion was improper because:  her ELEA 2

---

**(continued…)**

> An employe shall be furloughed only if at the time of furlough, the employe is within the lowest quarter among all employes of the employer in the same class on the basis of their last regular service ratings, and within this quarter the employe shall be furloughed in the order of seniority unless there is in existence a labor agreement covering the employes to be furloughed, in which case the terms of such labor agreement relative to a furlough procedure shall be controlling:  Provided, That the appointing authority may limit the application of this provision in any particular instance to employes in the same class, classification series or other grouping of employes as referred to in any applicable labor agreement, and which are in the same department or agency within the same bureau or division….  Under the rules a regular employe furloughed shall for a period of one year be given preference for reemployment in the same class of position from which furloughed and shall be eligible for appointment to a position of a similar class in other agencies under this act unless the terms of an existing labor agreement preclude the employe from receiving the preferential treatment contained in this section in which event the terms of the labor agreement shall be controlling.

71 P.S. §741.802(a), (c).  *See also* Section 101.1(l) of the Commission's regulations, 4 Pa. Code §101.1(l) ("If there is a labor agreement covering the employees to be furloughed, the terms of the agreement as to furlough and reemployment procedures shall be controlling.").

[3] Section 3(r) of the Act defines "demotion" as the "voluntary or involuntary movement of an employee to a class assigned to a pay range with a lower maximum salary."  71 P.S. §741.3(r).

3

position was federally funded and should not have been affected by the state budget; the Department never implemented the proposed reorganization supporting her furlough; the Department lacked the authority to eliminate the ELEA 2 position because it was "critical;" and the position was never really eliminated because it appeared as "Vacant" on the Department's website as of November 2013.

Kolega also alleged traditional discrimination due to her age and disability, as well as that her furlough was taken in retaliation for prior actions she brought before the Pennsylvania Human Relations Commission (PHRC). Kolega also alleged technical discrimination because: the Department failed to demonstrate lack of funds or lack of work as required by the Act; the Department failed to comply with the requirements of Section 101.1(c) and (d) of the Department's regulations regarding furloughs;[4] and the Department targeted her as

---

[4] 4 Pa. Code §101.1(c), (d). Section 101.1(c) and (d) state:

(c) *Furlough units*. Furloughs will be conducted within approved furlough units. For purposes of this section, a furlough unit shall be defined as all employees in the classification within an affected institution, division, bureau or a combination of the institutions, divisions or bureaus within an agency. Each appointing authority will submit recommended furlough units to the Director. Once approved by the Director, these furlough units will be used for subsequent furloughs. Changes to the approved furlough units shall be submitted to and approved by the Director prior to their use in subsequent furloughs.

(d) *Order of furlough*. When a furlough is necessary, the last annual or probationary performance evaluations, as applicable, of regular employees in the same furlough unit and class shall be converted to categories or relative ranks. The employees will be placed into quarters, and those in the lowest quarter will be furloughed or returned under subsection (e), in the inverse order of

**(Footnote continued on next page…)**

a unit of one because there were 50 or more other GGO-funded employees in the Office of Elementary and Secondary Education that could have been furloughed.

At hearing, Rita Perez (Perez), the Bureau's Director at the time of the furlough, testified that she managed the Curriculum, Federal Programs, Student Services and Planning Division, including each division's program and personnel. She stated that there were a total of 21 positions that were abolished in August 2013, 18 of which were vacancies and three actual positions that were furloughed which included Kolega's position. Perez testified that Kolega was furloughed as part of an overall Department deputate reorganization plan that included collapsing the Bureau of Assessment into the Bureau of Teaching and Learning to repurpose two divisions in each bureau. Perez stated that following review, they determined that they had the staffing necessary in both bureaus in English Language Arts and did not need the third Language Arts position, Kolega's position, to accomplish necessary tasks because there were already two federally-funded Education Assessment Specialists in the Assessment Bureau. She explained the appropriateness of Kolega's furlough as follows:

> It was appropriate because we already had two folks in the Bureau of Assessment who focused on English Language Arts type of assessments. Moving forward in that position, the Department is to focus more on the assessment part of curriculum and assessment.

---

**(continued…)**

> classified service seniority. Seniority for this purpose shall be the length of continuous service in the classified service if there has been no break in service.

> We had two people filling that position, and we did not need a third person.

(Reproduced Record (RR) at 88a-89a).

Perez testified that she first became aware of the furloughs during budget discussions with the Department's Deputy Secretary at that time, Carolyn Dumaresq (Dumaresq), and the Chief of Staff at that time, David Folkman. She stated that she made the decision to furlough Kolega in collaboration with Dumaresq. She testified that she did not discriminate against Kolega on the basis of age, disability or any other non-merit factor and did not retaliate against Kolega.

Diane Hershey (Hershey), the Director of the Bureau of Human Resources, testified that the Governor's Budget Office issued a proposed budget in February 2013 requiring the elimination of 21 GGO positions. She stated that she found 18 vacant GGO positions that were eliminated and that three program deputies recommended the remaining three GGO positions that would be eliminated: an Education Executive 1 position in the Office of Child Development and Early Learning; a clerk typist from the Office of Post-Secondary Education; and Kolega's ELEA 2 position in the Office of Elementary and Secondary Education. She testified that Kolega's position "[w]as not federally funded. It was GGO funded from July 1st, 2006. I can't remember exactly when [Kolega's predecessor] started. But the federal money was dried up, was eliminated. So we moved the job to general government operations, GGO money July 1st, 2006." (RR at 158a). Hershey acknowledged that Kolega's Exhibit 16 showed that the Department's website listed Kolega's ELEA 2 position as "Vacant," but that the

Department's press office prepares the website and that that position had been abolished. (*Id.* at 159a, 160a).

Hershey stated that the reason that Kolega's position was chosen for elimination was because "there's two employees [in the Assessment Bureau] doing assessment work relative to English Language" and "[w]e would have duplicative … work because there are two positions in assessment, Bureau of Assessment and Accountability that are performing the assessment work." (RR at 156a, 544a). She testified that the clerk typist was able to bump into a federally-funded position and that Kolega was able to bump into the BEA 1 position under the CBA. She stated that she prepared a letter for the acting Department Secretary requesting approval of the furlough by the Secretary of Administration; the furlough was approved; Kolega was notified that she was to be furloughed and that she could bump into the BEA 1 position that she previously held, one pay scale group lower, because there were no other ELEA 2 or ELEA 1 positions; and that Kolega elected to accept the offered position. Hershey stated that she was involved in various efforts to accommodate Kolega's disability and that she never denied any of the requests for accommodation. Hershey denied that she discriminated against Kolega based on age, disability or any other non-merit factor and did not retaliate against Kolega.

The Union's President, William Betrand, testified for Kolega that he was notified by e-mail of the Department's decision to furlough Kolega. He stated that he met with representatives of the Department and the Office of

7

Administration to inquire into the reasoning for Kolega's furlough. He testified that he is not aware of any violation of the CBA's process in Kolega's furlough.

Kolega testified that at an August 2013 meeting, she was given a copy of the written notice of furlough which stated that she "was being furloughed for economic reasons," and that she "would be demoted to an EL[E]A 1 in another division." (RR at 344a). She stated that she was not told that her ELEA 2 position was being eliminated at that meeting, but she was told that only the GGO complement had been reduced as opposed to federally-funded positions. She explained that in her prior position, she was responsible for overseeing the English language standards contained in the "Pennsylvania Core Standards," as provided in the Department's regulations.[5] She testified that the mathematics advisor and a number of younger individuals designated as contacts on other areas of study were not furloughed, and that contractors and consultants are currently overseeing the English language standards. She stated that she was told that the ELEA 2 position was going to be federally-funded when she was placed in that position in July 2011, and that her predecessor in the position, Jo Beth McKee, had been federally-funded, but that her travel expenses were state-funded. (RR at 372a-375a).

---

[5] *See* Section 4.3 of the Department's regulations, 22 Pa. Code §4.3 ("*Pennsylvania Core Standards*—Academic standards for English language arts and mathematics based upon a Nationwide, state-led process coordinated by the National Governors Association and the Council of Chief State School Officers and in collaboration with teachers, content experts and other education stakeholders. The standards define the knowledge and skills students should have within their K-12 education careers so that they will graduate high school able to succeed in entry-level, credit-bearing academic college courses and in work-force training programs.").

Kolega also testified regarding her 2008 and 2013 requests for accommodations under the Americans with Disabilities Act[6] (ADA) and noted that some had been accepted based upon her 2008 request. She stated that the 2013 request reiterated the 2008 request because she had a supervisor who had complained about her needing assistance, and that in July 2013, the Department approved the same accommodations as previously granted. She testified that the ADA accommodations were part of her complaint to the PHRC. Kolega acknowledged that she is currently the Department's Refugee Program Officer with bi-weekly pay of $2,715.00.

Sarah Flaherty, the Acting Chief of the Curriculum Division, testified for Kolega that she was not aware of the planned reorganization and that she was not consulted regarding the Department's furlough decisions. She stated that Perez told her over the telephone about Kolega's furlough and where Kolega was moving in the Department. She testified that while she has worked with contractors with respect to English Language Arts, the contractor that she has been working with, Jean Dyszel, has not been performing English Language Arts duties and she does not know who, if anyone, is performing Kolega's former duties.

Barbara Dychala, the Department's Labor Relations Coordinator, testified that she did not participate in any furloughs, but she coordinated and participated in the August 2013 meet and discuss meeting that the Union had requested. She stated that the matters discussed at that meeting related to Kolega's

---

[6] 42 U.S.C. §§12101-12213.

furlough and that she summarized the meeting and responded to the concerns expressed there in a September 2013 letter.

John Gasdaska, the Office of Administration's Director of Labor Relations, testified that his primary role in furlough actions is to implement the contractual seniority provisions and to provide notification to the relevant union. He acknowledged that "the agency has broad discretion in that area to show lack of money and how they are going to address it [through furloughs]," (RR at 488a), and that he did not discuss with Hershey whether the English Language Arts position was critical. He stated that he participated in the August 2013 meet and discuss meeting, but that the Department researched the issues that were discussed and prepared and sent the response.

Debra Jenkins (Jenkins), a budget analyst in the Department's Bureau of Budget and Fiscal Management, testified that she deals with cost codes which are used to charge accounts for payment. She stated that she prepared statements recording the cost codes used by the Department for the ELEA 2 position in 2010 and 2011. She testified that the ELEA 2 position was paid with federal funds when it was held by McKee in 2010, and that the ELEA 2 position was paid with GGO funds when it was held by Kolega in 2011. (RR at 515a-517a). She stated that "[in] 2008, Jo Beth McKe[e] had applied for and received a Striving Reader Grant and a Reading Recovery Grant so she was managing federal funding. So it was deemed her position could be federally funded and not be in federal audit." (*Id.* at 525a). Nevertheless, she testified that when Kolega went into the ELEA 2 position, it was state-funded. (*Id.* at 519a).

10

## III.

The Commission dismissed Kolega's appeal. Regarding Kolega's claim that the ELEA 2 position was federally-funded, the Commission noted that the only evidence that she offered in support was her own testimony. However, it noted, though, that Kolega's own witness, Jenkins, testified that even though Kolega's predecessor in the position applied for and received federal funding, her position was state-funded through GGO funds as of October 2011. As a result, the Commission "conclude[d] that [Kolega] has failed to refute the [Department]'s inclusion of her position as subject to the GGO-based reduction." (RR at 891a).

The Commission also rejected Kolega's claims that the Department relied upon the staffing proposals in a never-fully-implemented reorganization plan, and that her ELEA 2 position was "critical" and had not actually been eliminated. The Commission determined that the fact that the reorganization plan was never fully implemented was irrelevant, because credible evidence was proffered that the reason that the Department eliminated her position was because there were other personnel who could perform her duties. The Commission also rejected Kolega's assertion that the ELEA 2 position was "critical," noting that "[w]hile the Code clearly emphasizes the importance of the English Language Arts, we have found no language dictating that the [Department]'s responsibilities be performed by the ELEA 2 or any other designated position." (RR at 892a n. 10). The Commission likewise rejected Kolega's claim that the ELEA 2 position was not eliminated, noting her evidence in support and stating that "[t]he [Department] has, through Hershey, introduced credible testimony establishing that the position has, in fact, been abolished." (*Id.* at 892a).

11

The Commission explained that because Kolega brought her age and disability traditional discrimination claims under Section 951(b) of the Act, she had the initial burden "to present evidence that, if believed and otherwise left unexplained, indicates that more likely than not discrimination has occurred" thereby establishing a presumption of discrimination requiring the Department to "introduce evidence of a 'non-discriminatory explanation' for the challenged personnel action." (RR at 892a-893a) (citations omitted). The Commission concluded that "[w]hile her presentation may be deemed adequate to meet the standard for a *prima facie* claim, the [Department]'s non-discriminatory explanation—*i.e.*, credible testimony that the English Language Arts duties could be performed by others ([RR at 156a-157a])—was sufficient to persuade this Commission that [Kolega]'s age and disability were not the reasons for the [Department]'s decision. (*Id.* at 893a). As a result, the Commission dismissed Kolega's age-based and disability-based discrimination claims because they were not "supported by credible evidence of an intent to discriminate." (*Id.*).

Regarding Kolega's technical discrimination claim under the Act that its provisions were not followed, the Commission determined that sufficient credible evidence establishing a *prima facie* lack of funds was submitted "through the presentation of the Budget proposal withdrawing funding for twenty-one positions," and a *prima facie* lack of work "through testimony establishing that [Kolega]'s position was, in good faith, eliminated in compliance with the proposed funding reduction." (RR at 894a). As a result, the Commission dismissed Kolega's argument in this regard "having found both a lack of funds and a lack of work." (*Id.*).

12

In regards to Kolega's technical discrimination claims that the Code provisions were not followed, the Commission found that they "have not been explained either at hearing or in her post-hearing Brief." (RR at 894a). Nevertheless, the Commission noted that both the Act and the Code "give[] precedence to the terms of labor agreements relative to furlough procedure" and that the Department presented credible evidence that Kolega's ELEA 2 position was subject to the terms of the CBA with the Union and that the CBA included a statement on the furlough procedures. (*Id.* at 894a-895a). As the Commission explained:

> As has been noted the procedure used to determine the effect of the decision to abolish [Kolega]'s position and [Kolega]'s furlough rights was based upon the [CBA] covering that position. The Commonwealth Court of Pennsylvania, in *Scuoteguazza et al. v. Commonwealth, Department of Transportation et al.*, [368 A.2d 869 (Pa. Cmwlth. 1977)], advised the Commission that while the Commission retained jurisdiction to determine the sufficiency of the agency's justification for furlough— *i.e.*, whether the agency has proven the existence of a lack of funds or a lack of work sufficient to necessitate a furlough—the Commission is not empowered to interpret the [CBA] to determine whether the agency adhered to a furlough procedure established thereunder.

(*Id.* at 895a n. 13). As a result, the Commission denied Kolega's technical discrimination claims.

Finally, regarding Kolega's retaliation claim, the Commission noted that she alleged that she had filed three separate age, disability and retaliation discrimination complaints with the PHRC, and that her furlough and demotion

13

were causally related thereto. However, because the Act does not provide a standard for reviewing retaliation claims, the Commission applied the standard for reviewing traditional discrimination claims and found that Kolega "failed to present evidence sufficient to show any causal connection between her PHRC complaints and her furlough; without such evidence, [her] allegation of retaliation has been deemed unproven." (RR at 895a-896a). The Commission also applied the standard used to establish a *prima facie* case of retaliation before the PHRC, and found that "[b]ased upon our ruling, it is apparent that, even using a specific retaliation standard, [Kolega]'s claim would have been dismissed." (*Id.* at 896a n. 14).

## IV.

## A.

In this appeal,[7] Kolega first argues that the Commission's determination that she was properly furloughed under Section 802 of the Act due to lack of funds or lack of work is not supported by substantial evidence.

---

[7] This Court's scope of review of a Commission adjudication is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law has been committed or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704; *Pennsylvania Game Commission v. State Civil Service Commission*, 747 A.2d 887, 891 (Pa. 2000). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Shade v. Civil Service Commission*, 749 A.2d 1054, 1056 n.5 (Pa. Cmwlth.), *appeal denied*, 764 A.2d 52 (Pa. 2000). The Commission is the sole fact finder in civil service cases, and it has the exclusive authority to assess witness credibility and evidentiary weight. *Bosnjak v. State Civil Service Commission*, 781 A.2d 1280, 1286 (Pa. Cmwlth. 2001). As a result, this Court will not disturb the Commission's determinations regarding credibility or the weight of the evidence. *Id.* In reviewing a Commission decision, this Court views the evidence and all reasonable inferences arising therefrom in a light most favorable to the prevailing party. *Id.*

Specifically, Kolega asserts that there is no credible evidence demonstrating a lack of funds because she presented credible evidence that her ELEA 2 position was federally-funded. She contends that there is no credible evidence demonstrating a lack of work because her ELEA 2 position was not eliminated, the proposed Department reorganization never took place, and no reason for the furlough was provided at the time that it was implemented.

The Department bears the burden of proof and the burden of going forward to make a *prima facie* showing that there was a lack of funds or lack of work. *See Dougherty v. Department of Health*, 538 A.2d 91, 93 (Pa. Cmwlth. 1988) (stating that the burden of proof is on the employer to establish a lack of funds or a lack of work in civil service appeals). In order for a furlough to be based upon a lack of funds, there must be insufficient revenue to meet all financial demands unless modifications are made in the Department. *Bumba v. Pennsylvania State System of Higher Education*, 734 A.2d 36, 38 (Pa. Cmwlth. 1999), *appeal denied*, 757 A.2d 935 (Pa. 2000); *County of Beaver v. Funk*, 492 A.2d 118, 121 n.6 (Pa. Cmwlth. 1985); *Forbes v. Department of Transportation*, 434 A.2d 892, 894 n.4 (Pa. Cmwlth. 1981). However, a furlough based on a lack of funds does not require a showing of bankruptcy; "[a] 'lack of funds' exists when insufficient revenue is available to meet all financial demands unless modifications are made in the system." *Id.*

A furlough based on a lack of work is proper when "the amount of work the employee is performing does not warrant [her] retention in view of the fact that the employee's work can more efficiently, from a cost or operational

15

standpoint, be performed through reassignment to others." *Department of State v. Stecher*, 484 A.2d 755, 758 (Pa. 1984). To show that a furlough was properly based upon a lack of work, the employer must show that: (1) a position was eliminated; (2) a reorganizational streamlining occurred; and (3) management believed in good faith that the employee's work could be conducted more efficiently in the absence of the eliminated position. *Id.* at 759; *Haskins v. Department of Environmental Resources*, 636 A.2d 1228, 1229 (Pa. Cmwlth. 1994). However, whether the employer could or should have cut other positions instead of the appellant's is not an issue before us; management, rather than the courts, is entrusted with the discretion to determine what actions will best promote the efficiency of the agency's service to the public. *Stecher*, 484 A.2d at 758; *Stover v. Department of Environmental Resources*, 636 A.2d 1275, 1277 (Pa. Cmwlth. 1994); *Vovakes v. Department of Transportation*, 453 A.2d 1072, 1074 (Pa. Cmwlth. 1982). "[W]hen an agency determines that necessary work can be performed adequately with fewer employees, thus saving Commonwealth funds, that agency is obliged to 'tighten up' its work force by eliminating excess positions." *Haskins*, 636 A.2d at 1229.

Contrary to Kolega's assertion as outlined above, there is ample substantial evidence supporting the Commission's determinations that her furlough was due to both lack of funds and lack of work. Perez testified that Kolega was furloughed as part of an overall Department reorganization that included collapsing the Bureau of Assessment into the Bureau of Teaching and Learning to repurpose two divisions in each, and that it was determined that they had the necessary staffing in both bureaus in English Language Arts and did not need Kolega's

16

position because of the two federally-funded Education Assessment Specialists in the Assessment Bureau. (RR at 88a-89a). Jenkins, Kolega's witness, testified that the ELEA 2 position was paid with federal funds when it was held by McKee in 2010, and that the ELEA 2 position was paid with GGO funds when it was held by Kolega in 2011. (*Id.* at 515a-517a). Hershey also testified that Kolega's position was paid with GGO funds. She also acknowledged that while Kolega's Exhibit 16 showed that the Department's website listed Kolega's ELEA 2 position as "Vacant," the Department's press office prepares the website and that that position had, in fact, been abolished. (*Id.* at 159a, 160a). She stated that the reason that Kolega's position was chosen for elimination was because there were already two employees in the Assessment Bureau doing assessment work in English Language Arts and that there was duplicative work based on those two federally-funded positions. (*Id.* at 156a, 544a).

Additionally, Kolega's furlough letter stated that she was being furloughed "due to a lack of funds." (RR at 309a). Moreover, it is immaterial even if no reason for the furlough had been provided Kolega at the time that it was implemented. A furlough, unlike other actions such as a termination for cause, is not predicated upon specific acts by the employee but, rather, external economic pressures and workplace reorganizations that are not easily distilled; for this reason, neither the Act nor the Commission's regulations require that the notice of furlough include a discussion of the justifications which the employer would later use if the furlough is challenged. *Martin v. State Civil Service Commission (Department of Community and Economic Development)*, 741 A.2d 226, 230-31 (Pa. Cmwlth. 1999) (stating that a furlough is not an adverse employment

17

determination requiring notice of the basis for the action); Section 105.3 of the Commission's regulations, 4 Pa. Code §105.3 (providing that only "[n]otices of removal, involuntary demotion or suspension issued to regular employees shall include a clear statement of the reasons therefore, sufficient to apprise the employee of the grounds upon which the charges are based…."). As a result, the purported absence of reasons for Kolega's furlough at the time of its implementation does not preclude the Department from raising those issues in her Commission appeal.

## B.

Kolega next argues that the Commission erred in determining that the Department did not engage in either technical discrimination or discrimination based on her age or disability or in retaliation for her complaints to PHRC. We do not agree.

There are two categories of discrimination that may be appealed to the Commission under Section 951(b) of the Act: "traditional discrimination" and "technical discrimination." *Pronko v. Department of Revenue*, 539 A.2d 456 (Pa. Cmwlth. 1988). Traditional discrimination claims under Section 905.1 of the Act[8] are based on factors such as race, sex, age, disability and national origin. *Id.* at 462. Technical discrimination claims are based on technical and procedural violations of the Act and related regulations. *Reck v. State Civil Service Commission*, 992 A.2d 977, 980 n.3 (Pa. Cmwlth. 2010). In order to obtain relief

---

[8] Added by Act of August 27, 1963, P.L. 1257, 71 P.S. §741.905a.

18

for technical discrimination, an employee must show that she was, in fact, harmed because of the technical non-compliance with the Act or evidence that because of the peculiar nature of the procedural impropriety, she could have been harmed but there is no way to prove that for certain. *Price v. Luzerne/Wyoming Counties Area Agency on Aging*, 672 A.2d 409, 413 (Pa. Cmwlth. 1996), *appeal denied*, 688 A.2d 174 (Pa. 1997).

**1.**

In traditional discrimination claims arising under Section 905.1 of the Act, the employee claiming discrimination in personnel actions has the burden of presenting evidence to support such a charge. *Cola v. State Civil Service Commission (Department of Conservation & Natural Resources)*, 861 A.2d 434, 436 (Pa. Cmwlth. 2004). In *Moore v. State Civil Service Commission (Department of Corrections)*, 922 A.2d 80, 85 (Pa. Cmwlth. 2007), this Court addressed the standard of proof for traditional discrimination claims enunciated by the Supreme Court in *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission*, 532 A.2d 315, 319 (Pa. 1987).

First, the plaintiff must produce sufficient evidence to establish a prima facie case. *Moore*, 922 A.2d at 85. To do so, the plaintiff must present sufficient evidence that, if believed and otherwise unexplained, indicates more likely than not that discrimination occurred. *Id.* Given the critical role of circumstantial evidence in discrimination cases, the *prima facie* burden of proof is not an onerous one. *Id.* Absent a credible response from the defendant, a presumption of discrimination arises and the plaintiff's prima facie case stands

19

determinative of the factual issue of the case. *Id.* If, however, the defendant offers a non-discriminatory explanation for the personnel action, the presumption drops from the case. *Id.* As in other civil litigation, the tribunal must then evaluate the entire body of evidence under the preponderance standard and determine which party's explanation of the employer's motivation it believes. *Id.*

Regarding Kolega's traditional discrimination claim, the Commission found that "the [Department]'s non-discriminatory explanation—*i.e.*, credible testimony that the English Language Arts duties could be performed by others ([RR at 156a-157a])—was sufficient to persuade this Commission that [Kolega]'s age and disability were not the reasons for the [Department]'s decision." (*Id.* at 893a). As outlined above, there is ample substantial evidence to support this determination that the furlough was purely based on non-discriminatory factors.

## 2.

Kolega alleges that the Commission erred in failing to find technical discrimination because the Department failed to furlough her in accordance with the seniority provisions of the Act[9] and Article 24, Section 7 of the CBA.[10]

---

[9] As noted above, Section 802(a) of the Act states, in relevant part, "That the appointing authority may limit the application of this provision in any particular instance to employes in the same class, classification series or other grouping of employes as referred to in any applicable labor agreement, and which are in the same department or agency within the same bureau or division…." 71 P.S. §741.802(a).

[10] Article 24, Section 7 of the CBA states, "In any class within the unit affected by layoffs or furloughs, all emergency, temporary and provisional employees shall be laid off or furloughed before any other employee." (RR at 630a).

Specifically, she argues that provisional or temporary employees are to be removed or furloughed before regular employees and that a consultant was hired to perform the duties of her position. However, the Commission found credible Hershey's testimony that "there's two employees [in the Assessment Bureau] doing assessment work relative to English Language" and that "[w]e would have duplicative … work because there are two positions in assessment, Bureau of Assessment and Accountability that are performing the assessment work." (RR at 156a, 544a). There was no Commission finding that the employees that were retained were provisional or temporary employees in violation of either the Act or the CBA.

### 3.

With respect to her retaliation claim, the Commission found that she "failed to present evidence sufficient to show any causal connection between her PHRC complaints and her furlough; without such evidence, [her] allegation of retaliation has been deemed unproven," and that under the standard used by the PHRC to establish a *prima facie* case of retaliation, "[b]ased upon our ruling, it is apparent that, even using a specific retaliation standard, [Kolega]'s claim would have been dismissed." (RR at 895a-896a n. 14). While Kolega cites evidence demonstrating, perhaps, that her furlough was temporally related to the retirement of her former supervisor against whom she had filed the PHRC complaints, she does not cite to any evidence found credible by the Commission which demonstrates the causal relation between the reports and her furlough. Simply, the Commission accepted as credible the Department's non-discriminatory motivation

for her furlough and bump into the vacant BEA 1 position in the Bureau's Student Services Division and we will not disturb that determination on appeal.

## C.

Finally, Kolega argues that the Commission erred in failing to take judicial notice[11] that the Department's website stated that her ELEA 2 position is vacant. However, in disregard of Pa. R.A.P. 2117(c) and 2119(e), Kolega has failed to include in her brief any statement advising us of the manner in which the issue was raised before the Commission and the place in the record where the preservation of this issue may be found. Therefore, we deem this argument waived.[12] Moreover, even if it is assumed that the Commission was required to

---

[11] As this Court has explained:

> "Official notice" is the administrative counterpart of judicial notice and is the most significant exception to the exclusiveness of the record principle. The doctrine allows an agency to take official notice of facts which are obvious and notorious to an expert in the agency's field and those facts contained in reports and records in the agency's files, in addition to those facts which are obvious and notorious to the average person. Thus, official notice is a broader doctrine than is judicial notice and recognizes the special competence of the administrative agency in its particular field and also recognizes that the agency is a storehouse of information on that field consisting of reports, case files, statistics and other data relevant to its work.

*Falasco v. Pennsylvania Board of Probation and Parole*, 521 A.2d 991, 995 n.6 (Pa. Cmwlth. 1987) (citations omitted).

[12] *See, e.g., In re Condemnation of Land for South East Central Business District Redevelopment Area No.1*, 946 A.2d 1154, 1156 (Pa. Cmwlth), *appeal denied*, 968 A.2d 233 (Pa. 2008), *cert. denied*, 556 U.S. 1208 (2009) ("[T]he statement of the case and/or argument portion of a brief must contain a 'specific reference to the places in the record' where the ruling, **(Footnote continued on next page…)**

take notice that the Department's website stated that the ELEA 2 position was vacant, as noted above, Hershey acknowledged that while Kolega's Exhibit 16 showed that the Department's website listed Kolega's ELEA 2 position as "Vacant," the Department's press office prepares the website and that that position had, in fact, been abolished. (RR at 159a, 160a). As a result, any purported error in this regard was harmless as the credible evidence rebutted the information on the website.

Accordingly, the Commission's order is affirmed.

_____
DAN PELLEGRINI, President Judge

_____
**(continued…)**

or exception thereto, appears in order to show that the question before the court was timely and properly raised below so as to preserve the question on appeal. Pa. R.A.P. 2117(c); Pa. R.A.P. 2119(e).").

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pamela Kolega,                                    :
               Petitioner          :
                                        :
          v.                                       : No. 2056 C.D. 2014
                                          :
State Civil Service Commission        :
(Department of Education),               :
              Respondent          :

# **O R D E R**

AND NOW, this 15th day of  October, 2015, the order of the State Civil Service Commission dated October 15, 2014, at No. 27958, is affirmed.

_____
DAN PELLEGRINI, President Judge